UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

FEB 1 6

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
NIGHT DEPOSIT BOX

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.:  16-CR-00434 |
| | ) |
| KEVIN CHRISTOPHER HEITING, | ) |
| | ) |
| Defendant. | ) |
| | ) |

### DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

Kevin Heiting, ("Heiting" or Defendant"), proceeding pro se,
respectfully motions this Court for compassionate release in
accordance with 18 U.S.C. § 3582(c)(1)(A) and the First Step Act,
Pub. L. No. 115-391, 132 Stat. 5194 (2018).  In support of this
motion Heiting provides the following information:

### I.   Background

Heiting was convicted of Distributing Child Pornography in
violation of 18 U.S.C. § 2252A(a)(2).  He was sentenced on April
19, 2018 to a term of imprisonment of 240 months and a term of
supervised release for life.  He was also ordered to pay $25,500
in restitution to various victims of his crime.

For much of his sentence, Heiting has been incarcerated at
Federal Medical Center, Lexington, KY.  ("FMC").  He has done
well here.

He seeks a reduction based on two sets of facts:  His health
issues coupled with the COVID-19 pandemic, which certainly increases

the risk to Heiting including the liklihood of severe trauma to his health up to and including death if he catches the virus; and secondly, the fact that this country, including the U.S. Government (particularly the United States Sentencing Commission (the "Commission")) has intimated that the sentencing ranges for sex offenders may be too harsh.

## II.   Compassionate Release Requests

Prior to the passage of the First Step Act of 2018, a court could only consider a motion for compassionate release from the Director of the BOP.  Congress changed that due, in part, to its surprise at how little the Bureau of Prisons ("BOP") granted this remedy.

The First Step Act, passed in December, 2018, made it lawful for defendants to request the BOP and then courts (given the compliance with certain prerequisites) for a compassionate release.  § 603 of the Fisrt Step Act; and 18 U.S.C. § 3582(c)(1)(A).

In a section of the First Step Act titled "Increasing the Use and Transparency of Compassionate Release," the law was changed by specific language:

> [Courts can modify sentences by] motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility.

(Id.).

A court may now modify a defendant's sentence if it finds on either the BOP's or the defedant's motion that "etraordinary

2

and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  3582(c)(A)(i).

The policy statement regarding compassionate release ("CR") sets forth three specific reasons that are considered "extra-ordinary and compelling" as well as a catchall provision recognizing as "extraordinary and compelling" any other reason "[a]s determined by the Director of the Bureau of Prisons."  U.S.S.G. Manual § 1B1.13 cmt. n.1 (U.S. Sentencing Commission, 2018).  It also requires that "the defendant is not a danger to the safety of any other person or the community," and that the court's determination is in line with "the factors set forth in 18 U.S.C. § 3553(a)." Id. at § 1B1.13(2) & cmt. n.4.[1]

Heiting first addresses "extraordinary and compelling" and its use in determining whether compassionate release requests are valid in specific cases.

Very little guidance exists on what constitutes extraordinary and compelling reasons warranting a sentence reduction under U.S.S.G. § 1B1.13 cmt. n.1(D).  Only the BOP was previously empowered to seek such relief, and it rarely did so.  United States v. Gutierrez, No. CR 05-0217 RB, 2019 WL 1472320, at *1 (D.N.M. Apr. 3, 2019).  The statute does not define--or place any limits

---

[1] That policy statement has not been amended since the First Step Act and some of it now clearly contradicts 18 U.S.C. § 3582(c)(1)(A), as defendant can now bring a motion to a court.  And courts note that the Commission does not have enough Commissioners at this time to vote changes.

on--what "extraordinary and compelling reasons" might warrant such a reduction.   Crowe v. United States, 430 F. App'x 484, 485 (6th Cir. 2011).  Black's Law Dictionary, however, defines "extraordinary" as "beyond what is usual, customary, regular, or common.  (10th ed. 2014)  And extrapolating from its definition of "compelling need," a compelling reason is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." Id.

Heiting submits that the world-wide and dangerous virus which is devastating prisons across this country is certainly "beyond what is usual or common."  Additionally, with the Commission--as well as some courts--balking at the time that is being given out to sex offenders, time which is in many cases enormous for first-time offenders, is also uncommon or unusual.

Heiting must also show that he has exhausted the statutory-required administrative remedies spoken of above.

### III.   Proper Exhaustion

Before this COurt can consider Heiting's motion, he must show it that he has properly exhausted any administrative remedy involved in getting the BOP to file a motion on his behalf.   To do that, he must show either that the warden has properly denied his request and he has properly, and fully, exhausted all appeals up to General Counsel or Director of the BOP; or, he has waited thirty (30) days from submitting his request to the warden and has not been given an answer to that requests.  18 U.S.C. § 3582(c)(1)(A); First Step Act, § 603.

Despite the relevant statutes discussing one (1) request to

4

the warden, FMC has required inmates to ask the warden twice. Once informally and a second time "formally." The Fisrt Step Act does not require this. For whatever reason, the BOP has made a simple requirement: (Ask the warden for a reduction in sentence), a very complicated, bureaucratic mess that nobody can even explain. Heiting filed his informal request on October 23, 2020. This informal request was never answered. Heiting filed his BP-9 for in accordance with BOP policy 1330.18 and 28 C.F.R. § 542.01 et seq.

So the BOP has changed the law to require two requests to the warden instead of one. The First Step Act required one request and gave the warden thirty days only because of the nature of some of these requests. Namely, people dieing. And while Heiting is certainly not about to die, Congress, as evident by the language of the FSA, and its legislative history, gave the BOP little room to do what it does best--mess things up.

Heiting has made his requests to this Warden. He has complied with the FSA and 3582. The BOP has not responded. The BOP just cannot seem to get its act together and the Courts and Congress seem to finally have had enough of it.[2] Good for them. Heiting has properly exhausted.

## IV.   Heiting's Two Reasons

As mentioned above, Heiting relies on two reasons for his request to this Court:  (1)  His health and the COVID-19 pandemic;

---

[2] The BOP has been having other issues as well including sexual harrassment at Coleman, the Jeffery Epstein matter and an issue of lies to Sen. Grassley over the BOP menu.

and (2)  The view in some circles that sex offender punishment is sometimes too harsh.

1.  Heiting's Health and COVID-19

Heiting is a 32-year old man.  He has health issues which are serious in nature.  He has several mental disorders and several physical ailments.  He is obese with a weight of 238 pounds and a height of 6' 02", giving him a BMI over 30.  His obesity is recent and alarmingly worsening with each year of incarceration.  He also suffers from hypertension with a blood pressure of 144/101 recorded on 11/15/2019.  This hypertension persists despite the use of two hypertension medications.  These two medications, propranol and prazosin, are given for anxiety and nightmare disorder respectively. Heiting also has had a heart murmur (irregular heart rythme) since a bout of scarlet fever at age 3.  He has been diagnosed with obstructive sleep apnea.  The heart murmur has persisted since age 3 but has been occurring off and on for the past few years. He has been diagnosed with a vitamin B12 deficiency while incarcerated.  He was diagnosed with allergic rhinitis (allergies to tree/grass pollen, dogs, and dust mites).  He has also tested positive for SARS COVID-19 in late December 2020.  He admittedly had few severe symptoms but this could be drastically different a second time around.  Heiting has a theory that COVID-19 virus will randomly select each victim as either a carrier or select the victim for severe life-threatening symptoms.  This previous bout with COVID-19 was lucky and he suffered with only a cough, congestion, severe body aches, exhaustion and nausia.  Heiting also believes the disease attacked his lungs, leaving him with

persistent shortness of breath; attacked his heart and kidneys as well.

Heiting also suffers from a long list of mental disorders, of which the court is already aware of of his major depressive disorder and schizotypal personality disorder.  The Court is not yet aware of the additional mental disorders he has been diagnosed with since entering the BOP.  These include social anxiety disorder (social phobia), generalized anxiety disorder, nightmare disorder, autism spectrum disorder, attention deficit hyperactivity disorder (ADHD) and insomnia disorder.  All of these disorders are listed in Exhibit B along with all other health problems.  Some of these new diagnoses, such as autism and ADHD, would have contributed to a downward departure for diminished capacity to avoid criminal behavior, which would have drastically lowered Heiting's sentencing guidelines.

Additionally, the COVID-19 virus sweeping the country makes all of these issues worse, especially the obesity, hypertension, heart murmur, sleep apnea and history of bronchitis.  A word or two is in order regarding the hypertension, obesity, sleep apnea and bronchitis that Heiting has and the U.S.'s stated position on inmates with these types of health issues:

> On May 18, 2020, the Department of Justice issued internal guidance which directs that the Government **concede that Defendants who have certain CDC risk factors . . . can establish that "extraordinary and compelling reasons" warrant the reduction in sentence.**

(See, United States v. Firebaugh, Case No. 16-20341-CR-UU (S.D. Fla.) (DE 43, "Government's Supplemental Response, p. 1, 6-1-20)). (emphasis added and ellipsis added).

7

This government response includes a list of (9) medical conditions. They include hypertension and (9) obesity. So then Heiting provides evidence that he has 2 conditions (at a minimum) that the U.S. agrees would facially satisfy the "extraordinary and compelling" requirement in 3582 and U.S.S.G. 1B1.13. And he asks this Court to please take judicial notice of this filing by the U.S. in the Southern District of Florida.

Thus far, Heiting has shown that he has properly exhausted his administrative attempts to get a motion filed by the BOP. He has also shown that he has many medical conditions which affect him to a great extent. Conditions that if exaserbated by the COVID-19 virus, could easily kill him. Where the government admits that the presence of one of the CDC comorbidities satisfies the requirement of "extraordinary and compelling" conditions for the granting of a motion, Heiting shows that he has at least two (2) to five (5) of the conditions, and maybe more!

Courts are taking hard looks at inmates that have health issues and some courts are releasing some of these inmates due to a combination of health issues and the COVID-19 pandemic. See, e.g., United States v. Beck, 2019 U.S. Dist. LEXIS 108542 (M.D. NC) (case not involving COVID-19, but cancer); and United States v. Brooks, No. 07-20047, 2020 WL 2509107 at *4 (C.D. Ill.).

But there is still more required than health issues. Most courts require some showing that the virus is actually present at the relevant facility and that the concern is not some generalized or speculative fear of COVID-19. Unites States v. Gorai, No. 18-220, 2020 WL 1975372 at *2 (D. Nev.).

8

At last count, FMC has had 9 virus deaths.  There have been several hundred cases at FMC so far.  More are expected.

Additionally, the Centers for Disease Control and the COVID-19 task force headed by V.P. Pence recommend social distancing. That is not easily done in prison.  Se, e.g., United States v. Colvin, 3:19-cr-179, 2020 WL 1613943, at *4 (D. Conn.).  And so, the issues with Heiting's health are made more serious by the effects of the virus and the environment of prison.

2. The Harshness of Some Sex Offenders' Sentences

Heiting also believes, notwithstanding his plea agreement, that he was over-sentenced.  He is a first-time prison inmate and he has had a crime-free/conviction-free life of nearly (3) decades.

The above assertion coincides with study after study that examine the child pornography issues that affect this country. "By far the largest subgroup of internet offenders, including those that are convicted of making child pornography would appear to post [sic] a very low risk of sexual recidivism."[3]

Additionally, according to the U.S.S.C. (Commission), the number of non-government sponsored below guideline sentences has increased 45% from 2006 to 2016.  Thus, it appears that courts are recognizing that the sentencing ranges for many sex offenders ("SOs")

_____

[3] See, L. Webb, J. Craissati and S. Keen, Characteristics of Internet Child Pornography Offenders: A Comparison With Child Monsters, 19 Sexual Abuse:  A Journal of Research and Treatment 4, 463 (2007).

This study has also application in future "dangerousness" too.

is out of whack.  Many juries feel the same way:  In one case, a defendant was found guilty after a trial for possession of child pornography.  Despite being a first-time offender and having a relatively modest number of images and video, his guideline range was 262-327 months.  The district court judge polled each of the 12 jurors asking what they thought the appropriate sentence should be.  The responses ranged from 0 to 60 months with a mean of 14.5 months and a median of 8 months.  12 ordinary people from the community recommended but a fraction of the guideline range.  United States v. Collins, 825 F.3d 386 (6th Cir. 2016).

Also, the current average extent of downward variances for SO sentences is 40.1%--meaning in those cases in which judges vary downwardly, they impose sentences that are on average 40.1% below the average guideline minimum.[4]

Also, none other than the U.S. Sentencing Commission has issued report after report discussing the Draconian nature of SO sentences and that Congress should act to fix this.  And if it does not, the courts should take note and act accordingly.[5]

Central to achieving the result of courts taking note of the extremism of many sentences is showing courts why the guidelines should be rejected.  Assistant Federal Public Defender Troy Stabenow has taken the lead in this endeavor.  See, Mark

_____

[4] U.S. Sentencing Commission, Sourcebook of Federal Sentencing Statistics (2018).

[5] Federal Child Pornography Offenses, U.S. Sentencing Commission, December, 2012.

Hansen, A Reluctant Rebellion, ABA Journal (June 2009).  Stabenow's memorandum[6] provided the analytical framework on which courts relied when holding the sex offender guidelines unsustainable, on policy grounds.[7]  Equally as important, the Sentencing Commission effectively corroborated his conclusions in its report.[8]

Of course, all of this empirical information is peripheral as it is this Court's sole perogative to grant relief related to any over-sentencing of the defendant for his crimes.

_____ _____

[6] See, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines, (available at http://www.fd.org/docs/Select-Topics---Sentencing/child-porn-july-revision.pdf).

[7] See, e.g., United States v. Henderson, 649 F.3d 955, 962 (9th Cir. 2011)(most amendments to the child pornography guidelines "were Congressionally-mandated and not the result of empirical study"); United States v. Grober, 624 F.3d 592 (3rd Cir. 2010); United States v. Dorvee, 616 F.3d 174 (2nd Cir. 2010).

[9] United States Sentencing Commission, The History of the Child Pornography Guidelines (Oct. 2009)(available at http://www.uscc.gov/Research/Research_Projects/Sex_Offenses/20091030_History_Child_Pornography_Guidelines.pdf).

There are many more studies that could be cited in the effort to paint the picture that SO sentences, especially for first-time offenders are much too harsh.  But there is no agenda to pile study upon study on this Court in the effort to show that the sentence was too harsh.  The point simply is to show that it is not just defendants who are making this attempt to un-muddy the sentencing water, but other courts, the Sentencing Commission, federal public defenders, scholars, law schools, and others. Ultimately, without action by Congress, there is nowhere else to turn but to sentencing courts for relief, and there are few vehicles to garner such relief other than 28 U.S.C. § 2255 motions and the type of motion that is presented here.

But these are the two grounds for which this request is made:  Health of the defendant in conjunction with the COVID-19 outbreak and the thinking across this country that the guidelines for SOs is seriously out of line with reality and that the scenario is not based on justice but rather on politics and the unpopularity (for lack of a better term) of the SOs in our society.

In concluding this section, it should be pointed out that the BOP has the authority to send the defendant to any facility that it wishes.  See, 18 U.S.C. § 3621(b); and Moore v. United States Att'y Gen., 473 F.2d 1375, 1376 (5th Cir. 1973).  See also 18 U.S.C. § 3621(f).

Relying on a set of unwritten criteria that considers both offense of conviction and prior criminal history, BOP officials at the Designation Center in Grand Prairie, TX., place "more serious" sex offenders at one of eight SO Management Programs (SOMPS).  By security level, SOMP locations are Low: FMC Devens (MA.); FCI Seagoville (TX); FCI Englewood (CO); and FCI Elton (OH); Medium:  FCI Petersburg (VA); FCI Marianna (FL); and FCI Marion (IL); and High: USP Tuscon (AZ).

The BOP did not see fit to place the defendant in this case at any such facility.  He's been placed at FMC Lexington, KY. This should speak volumes about this defendant.

### V.   Dangerousness and 3553(a)

In contemplating a 3582 motion, a court must consider other factors as well.  CR is appropriate only where the "defendant is not a danger to the safety of any other person or to the community,

12

as provided in 18 U.S.C. § 3142(g).  See also, U.S.S.G. 1B1.13(2).

Some of the factors to be considered are the nature and circumstances of the offense (e.g., was a weapon used; were people physically harmed); the history and characteristics of the defendant; and whether the defendant was on parole, probation or supervised release when the offense(s) were committed.

In this case, the defendant did not use a weapon, was not on parole or probation etc., did not harm anyone physically, nor were threats made.  Regarding the defendant's history and characteristics, he has always worked, maintained a clean criminal record and provided for himself.  His PSI shows all this as well.

For these reasons 3142(g) should not be an impediment to the granting of this motion.

Likewise, the 3553(a) factors must also be considered.  They include (once again) the nature and circumstances of the offense and the defendant, the need for the sentence imposed (to reflect the seriousness, to promote respect for the law, and to provide just punishment), to afford adequate deterrence to criminal conduct, to protect the public from the defendant and to provide the defendant with medical, technical, educational or other correctional treatment as needed.

This defendant has already served a substantial amount of time and there is simply no reason to doubt that the time served already has but accomplished the goals listed in 3553(a).  Additionally, there is no evidence in his inmate central file that any such goal has not been met.

Therefore, it would appear that the 3553(a) factors should

13

not stand in the way of the granting of this motion if the Court
is predisposed to grant same.  But of course, this is Heiting
asserting his own self-serving conclusions.  So it would behoove
the parties here to see what others have said about Heiting and
his propensity to be dangerous or to re-offend.

The Federal Bureau of Prisons has conducted what is called
a "PATTERN" test/score on Heiting.  Its goal is to establish with
some degree of certainty, what the chances are of an inmate
re-offending.  The BOP scored Heiting as "Low" in the chances of
him re-offending.  And courts throughout this country take the
BOP's position on many matters as Gospel.  In this instance,
that helps an inmate for a change.

### VI.   Release Plan

Heiting's mother owns a home at 407 Vierling Dr., Silver
Spring, MD.  This residence was where Heiting lived while on
pre-trial release.  The home doesn't have any under-age persons
living there and no persons living in the home has any criminal
history.

Financial support would consist of welfare from family
including his mother.  As for insurance and medical care, Heiting
will sign up immediately for insurance coverage on one of the
health care exchanges.  This would cover all of his medical,
dental and prescription coverage, thus allowing him to continue
various treatments for his ailments without further cost to the
U.S. taxpayer.

### VII.   Rehabilitation

Rehabilitation efforts on the part of a defendant cannot be

14

the sole rationale for granting a reduction in sentence under 3582.
But such efforts can be considered among all the factors viewed.
Pepper v. United States, 562 U.S. 476 (2011).

Heiting has stayed out of trouble since his sentencing and
avoided receiving any incident report.  He has programmed to the
fullest extent possible, including the non-residential drug abuse
class, mythbuster season 2, spanish history, attitude and esteem,
CDL course and basic cognitive skills.

Additionally, he has participated as part of the CARE 3
mental health program, where he has received mental health
counseling and been diagnosed with the aforementioned mental
disorders.  He has willingly participated in mental health
psychotropic medications which are listed in Exhibit C.

In short, the defendant is trying to rehabilitate to the
best of his abilities.  As a result, it is respectfully asked
that this Court consider these efforts by Heiting in his efforts
to get home to his family.

## VIII.  Conclusion

Because he suffers from health issues, as described above
and in his exhibits, and in conjunction with the COVID-19 pandemic,
the defendant asks this Court to grant him a compassionate release.
In addition to this, Heiting also asks this Court to consider
other authorities and their views on the sentences of sex offenders
(computer pornography) throughout the country, and the wide-spread
thought that some sentences are way out of proportion with the
acts committed.

The COVID-19 vaccines which are being released will not
reach the prison system or Heiting's age range any time soon.

The CDC recommends that persons over the age of 65 receive the vaccine first along with health care first responders.  There are over 53 million americans over the age of 65 alone.  Additionally, Heiting is set to refuse the vaccine if offered to him, due to his belief that the vaccine contains oestregen, a chemical castration drug.  So both facts that Heiting is unwilling and even unable to take the vaccine place him in continued danger as the pandemic progresses.

The fact that Heiting has already contracted the COVID-19 virus displays the risky environment that he is imprisoned in. The fact that he has contracted the virus once means he is only immune for a short period of time (3 months) and could easily contract the virus a second or even third time as has been the case with numerous inmates at FMC Lexington.

Heiting submits that neither 3142(g) nor 3553(a) would stand in the way of the granting of this motion.  And so, for all these reasons, Heiting respectfully asks this Court for a reduction in sentence to time served and release from prison.

Respectfully Submitted,

Dated: 01/01/2021

Kevin Heiting

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the fore-going and all exhibits were duly served on the U.S. Attorney for the District of Maryland this _____ day of February, 2021, by

16

First Class U.S. Mail, with the proper postage and correct address affixed.

_____

Kevin Heiting